| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No.: 3:10-00861 Judge Sharp |
| GREGG APPLIANCES, INC., ) ) ) | |
| Defendant. ) | |

## MEMORANDUM

In this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, Plaintiff, the Equal Employment Opportunity Commission, alleges that Defendant Gregg Appliances, Inc. unlawfully retaliated against and discharged Courtney Keen for her reporting sexual harassment. Defendant has filed a Motion for Summary Judgment (Docket No. 63), and that Motion has been fully briefed by the parties.[1]

### I. FACTUAL BACKGROUND

The following are the relevant facts. These facts will be expanded upon where necessary for purposes of the legal analysis.

Gregg is a retailer of appliances and home electronics. It operates a store in Murfreesboro, Tennessee.

---

[1] The EEOC has filed a Motion for Partial Summary Judgment in relation to several of the affirmative defenses raised by Gregg. That Motion is addressed by separate Order and Memorandum issued contemporaneously herewith.

1

In late 2008, Keen was as an Assistant Manager[2] at the Murfreesboro store. Depending upon who was in the store at the time, Keen worked under the Operations Manager or the Sales Manager. All of those managers report to the General Manager, who is the head manager at the store level. The General Manager, in turn, reports to a Regional Manager who oversees a number of stores.

On December 29, 2008, Ken Sundwall became the General Manager of the Murfreesboro store. The Regional Manager over the Murfreesboro store was Matt Skinner.

Keen got along well with Skinner, but had mixed results working with Sundwall.[3] When she worked with Skinner at the Rivergate Store she found him to be a bit unpleasant, but when she worked with him at the Mt. Juliet and Cool Springs stores she had no issues with him.

Sundwall, a military veteran, would write-up employees, even for minor violations of policies and procedures. His purpose, ostensibly, was to correct the perceived performance deficiencies so that the employee could grow and succeed.

Like all General Managers, Sundwall had the discretion to issue corrective actions to employees without consulting the Regional Manager or Human Resources. Sundwall claims that, shortly after becoming General Manager at the Murfreesboro store, he began to recognize that Keen's work was deficient in a number of respects, and he began to issue write-ups. The corrective action write-ups were many, including, a Counseling on January 3, 2009; a Verbal Warning on January 7, 2009; a Verbal Warning on January 11, 2009; a Written Warning on January 19, 2009; a Written Warning on January 26, 2009; a Verbal Warning on January 29, 2009; a Final Warning

---

[2] Assistant Managers have completed the formal training portion of Gregg's Manager in Training program, but remain under the umbrella of that program while gaining experience. If their performance warrants, Assistant Managers may move to Operations Manager or Sales Manager at a store.

[3] On occasion, Keen worked with Sundwall during store openings, or when she substituted for an absent Assistant Manager.

2

on February 7, 2009; a Counseling on February 9, 2009; a Verbal Warning on February 28, 2009; a Counseling on February 28, 2009; and a Counseling on March 2, 2009. All of these corrective actions were issued on Sundwall's own authority, without consulting any higher-ups. Keen did not complain about any of the write-ups, either to Skinner or Human Resources. Prior to that time she did not have any written disciplinary write-ups, and her personnel evaluations consistently reflected that she exceeded expectations.

On March 14, 2009, Keen was given a final written warning and placed on a 30-day performance improvement plan (PIP). Although Sundwall claims that this was because he had not seen improvement in her performance, the PIP was issued after he forwarded an email to Skinner dated March 6, 2009, complaining that Keen had failed to follow instructions in that she had failed to place (or insure that they were in place) 7 to 8 "blaster tags" on the end of racks.[4] Skinner, in turn, forwarded the email to Cynthia Bush, an Employee Resource Specialist, along with the following observations:

> When you look into Courtney Keens file, you will see she has been given a counseling, verbal, written, and final written warning on following managment [sic] direction (putting out blaster tags ), and then this past Friday, looks like, again, she did not follow direction.
>
> I spoke with Mr. Salow[5] and he told me to get with you on what the next step is, due

---

[4] Blaster tags are small price tag placed on the end of racks hanging from slats on the wall. The tags identify the price of the items on the rack. Usually, the blaster tags are used for smaller items such as cables and batteries. It was not uncommon for blaster tags to go missing, either because they had fallen off, or had been taken by customers who used them to compare prices at other stores.

Blaster tags are the responsibility of customer service representatives who are hourly employees. Skinner does not know whether any managers aside from Keen were assigned responsibility over blaster tags, nor did he ever question Sundwall as to why she was tasked with ensuring the placement of blaster tags.

[5] Salow is the Vice President over the southwest division encompassing approximately 55 stores in Tennessee, Alabama, Georgia, South Carolina, North Carolina and Kentucky. He previously served as the Regional Manager over the Murfreesboro store. Salow does not recall the specifics of the conversation, but

3

>   to the fact she was already on her final written on the same subject. If you could look at these for me and let me know asap. I would like to know what to do with this by Monday afternoon so we can take whatever appropriate action is required.

(Docket No. 74-5 at 2).

In response, Bush emailed Skinner, asking whether "there are any other assistant managers who failed to follow management directions similar to Keen?" Id.[6] Skinner replied that he would have to have Sundwall get back on that but "if you look into Scott Rudy or Charlie Panerts file you should see some documentation on them as well from the GM." (Id.).

At Skinner's direction, Sundwall contacted Bush regarding the precise language to be used in a written corrective action plan. Also at Skinner's direction, Sundwall sent Bush his draft of a PIP dated March 12, 2009.

At the time, Sundwall believed that Bush had to approve any final action plan action when it documented multiple policy violations. According to Bush, this is not so because General Managers can issue final written warnings without approval of Human Resources, but "when they want to escalate it, they can contact human resources." (Docket No. 63-5, Bush Depo. at 57)

Upon review of Sundwall's draft, Bush instructed him by email to include language that "failure to reach the above-mentioned goals will result in further disciplinary action up to and including termination," and instructed him to change the review date to thirty days after it is actually entered. (Docket No. 63-5, Ex. 1). Also in that email, Sundwall was instructed to make sure that he had substantiation for each of the prior disciplines, and that the performance issue had been

---

he remembers telling Skinner to get in touch with Bush, and stated in his deposition that Keen's actions could be considered insubordination.

[6] Bush also asked for signed copies of certain disciplinary documents, which Skinner said he would provide.

4

addressed with Keen.

Sundwall claims that, a couple of weeks into the 30-day improvement plan, he was still disappointed with Keen's performance and her on-going work deficiencies. On April 8, 2009, he e-mailed Bush a summary of his observations and noted continuing problems evidenced by at least four counseling sessions during the ten day period between March 20, 2009, and March 30, 2009. He concluded the e-mail by asking, "where do you want me to go from here?" (Docket No. 63-4 at 42).

Sometime after receipt of Sundwall's latest email, Bush decided to terminate Keen's employment.[7] Bush claims that the decision was based upon continued performance deficiencies as evidenced by Sundwall's repeated write-ups which she claims she had no reason to question. Bush does not recall talking to Sundwall about Keen.

Either by phone or email, Bush directed Skinner to go to the Murfreesboro store and, along with Sundwall, notify Keen that she was being terminated for unsatisfactory performance. Keen was so informed on April 16, 2009, and terminated that day.

On or about October 23, 2009, Keen filed an EEOC Charge against Gregg. In it, she alleged she had been given verbal and written warnings, adverse performance evaluations, and other disciplinary actions in retaliation for filing an internal complaint.

At this point in the factual narrative, it is necessary to take a chronological backstep. In mid-December 2008, Sundwall's predecessor, Mike Adams, told Skinner that Keen was romantically involved with another Gregg employee in violation of Gregg's anti-fraternization policy. On

---

[7]Bush claims it was her decision alone; Sundwall claims it was his understanding "Bush ultimately directed the termination of Ms. Keen's employment," and that he "did not make the decision to terminate," but agrees that "it was appropriate." (Docket No. 63-8 Sundwall Dec. ¶ 4)

5

December 22, 2008, and while Skinner was investigating Adams' report, Keen complained to Skinner that Adams had made unwanted advances toward her and had periodically sent her inappropriate text messages. Skinner notified Bush of Keen's complaint, and, at Bush's direction, launched an investigation which substantiated Keen's complaint about Adams. Adams' employment was terminated on December 23, 2008, the day after Keen's complaint was substantiated. Skinner did not recommend Adams termination, nor did he oppose it.

Keen kept her complaint about Adams confidential, and did not discuss it with anyone at Gregg, other than Skinner. Sundwall claims he had no knowledge about the complaint until months after Keen's termination and her filing of the EEOC charge, and both Bush and Skinner claim they never told Sundwall about the complaint

At the time of his termination, Adams had worked for Gregg for 26 years. According to Ron Fritz, a retired Gregg employee who worked at the Murfreesboro store for six years, after Adams was terminated, Skinner escorted him from the store, and the two then hugged and shook hands. Despite being terminated, Adams returned to the store shortly thereafter to cook the turkeys for the store's annual Christmas party.

After Adams' termination, Skinner transferred Sundwall from the Cool Springs store to the Murfreesboro store. At the time of the transfer, Sundwall was the General Manager of the Cool Springs store, having previously been a sales associate at that store. Skinner recommended Sundwall for the Manager in Training program, and later promoted him to the position of General Manager at the Cool Springs store.

In the six month period before being transferred to the Murfreesboro store, Sundwall issued David McCorkle, his Sales Manager, eleven corrective actions that included 9 policy violations and

6

Case 3:10-cv-00861   Document 109   Filed 06/25/13   Page 6 of 16 PageID #: 1775

2 performance improvement plans. Some of the reports were issued because McCorkle left the store, failed to follow instruction from Skinner and violated Gregg's procedures for handling cash. Sundwall never issued McCorkle a final warning, nor was McCorkle discharged.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" involving a discrimination charge. This clause affords "'exceptionally broad protections'" and "'extends to persons who have participated in any manner in Title VII proceedings.'" Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008) (quoting, Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000)).

In the absence of direct evidence of retaliation (and there is none here), the Court utilizes the burden shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff is first required to establish a *prima facie* case of retaliation and, if he or she does so, a presumption of retaliation arises, with the burden of production shifting to defendant to articulate some legitimate, nondiscriminatory reason for its action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2009). If the defendant articulates such a reason, the presumption drops from the case, and the plaintiff is then provided the opportunity to show that the reason offered by the defendant is but a pretext for retaliation. See, id. at 508. "The burden of persuasion remains with [plaintiff] throughout, even while the burden of production shifts between the parties." Ladd, 552 F.3d at 502.

To establish a *prima facie* case, the EEOC in this case must show that (1) Keen engaged in protected activity, (2) the activity was known to the defendant, (3) Keen was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. Harris v. Metropolitan Govt. of Nashville and Davidson County, 594 F.3d 476, 485 (6th Cir.

8

2010). Here, Gregg asserts that the EEOC cannot establish the second and fourth elements of a *prima facie* case.

With regard to the second element, Gregg argues that the EEOC "has no evidence from which a reasonable jury could infer that Sundwall knew or was aware of Keen's protected activity." (Docket No. 64 at 7). To be sure, Sundwall flatly denies such knowledge pre-EEOC charge, and both Bush and Skinner claim not to have told him about the charges.

However, "'knowledge of a plaintiff's prior protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse action." Hicks v. SSP America, Inc., 490 Fed. Appx. 781, 785 (6th Cir. 2012) (citation omitted). Here, there was prior interaction between Sundwall and Skinner, interaction which led to Sundwall being promoted to General Manager of the Cool Springs store and transfer to the Murfreesboro store. Moreover, Gregg claims that Bush is the one who made the termination decision and she indisputably knew about the complaint.

As for the fourth prong, Gregg argues that the EEOC cannot establish that the sexual harassment complaint was the likely reason for any adverse employment action.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516 (6th Cir.2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id.

9

In this case, there was a temporal proximity between Keen's complaint about Adams and her termination, as the two events were separated by less than four months  Moreover, the record shows that prior to Sundwall's arrival at the Murfreesboro store Keen had not been the subject of any written corrective actions.  However, within days of Adam's termination, she received a write-up, and was subjected to a string of write-ups thereafter, some of which had to do with the placement of blaster tags, a duty normally given to an hourly customer sales associate.  This is sufficient to establish causation.  See, Hamilton v. Gen. Elec., 556 F.3d 428, 436 (6th Cir. 2009) ("We hold that this temporal proximity of less than three months combined with the assertion that [the employer] increased its scrutiny of [plaintiff's] work only after the EEOC complaint was filed are sufficient to establish the causation element of a prima facie case of retaliatory termination"); Hale v. ABF Freight Sys. Inc., 503 Fed. Appx. 323,  331 (6th Cir. 2012) ("increased demands or criticisms of a person's work performance in close temporal proximity to an adverse employment action can be probative of unlawful animus").

Additionally, the EEOC relies upon the "cat's paw theory" of liability for causation.  This theory "refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse decision, thereby hiding the subordinate's discriminatory intent."  Cobbins v. Tenn. Dep't of Transp., 566 F.3d 582, 586 n. 5 (6th Cir. 2009).

In Staub v. Proctor Hospital, 131 S.Ct. 1186, 1194 (2011) the Supreme Court stated that "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable[.]"  The Court also observed:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to
> the supervisor's original biased action . . . , then the employer will not be liable.  But

10

> the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

Id. at 1193. Thus, under Staub, animus can be imputed to the decisionmaker where plaintiff can show (1) the non-decisionmaker intended to cause an adverse employment action, and (2) the non-decisionmaker's discriminatory action is a proximate cause of the ultimate employment action, both of which may present jury questions. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 351 n.10 (6th Cir. 2012).[8]

Here, there are questions of fact on (1) whether Skinner harbored ill-will towards Keen as a result of her informing on Adams; (2) whether Sundwall was an innocent operative who truly found legitimate fault with Keen's performance (or whether, instead, he acted in alliance with Skinner's alleged desire to be rid of Keen; (3) whether Skinner influenced Bush during the course of their conversations; and/or (4) whether Bush based her decisions simply upon what Sundwall reported. These are questions that can only be answered by the jury through the assessment of the credibility and demeanor of Skinner, Bush and Sundwall.

The Court recognizes Gregg's assertion that the "cat's paw" theory is inapplicable here because Skinner has not been shown to have been a subordinate of Bush. However, Skinner was unquestionably a supervisor over Keen, and, while the Supreme Court in Staub left open "the question whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment," the whole point of the "cat's paw theory" is to hold a company accountable for supervisors who, for improper reasons, influence the

---

[8] "While Staub dealt with a discrimination claim pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), the Court's reasoning applies with equal force to claims brought under Title VII." Id. at 351 n.10.

11

decisionmaker. See, Madden v. Chattanooga City Wide Serv Dept., 549 F.3d 666, 677 (6th Cir. 2008) (cat's paw theory is used to establish "a causal nexus between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus"); Arendale v City of Memphis, 519 F.3d 587, 604 n. 13 (6th Cir. 2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability").

The Court also recognizes Gregg's citation to Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1152 (8th Cir. 2011) for the proposition that cat's paw cases involve direct-evidence claims, not claims pursued under the burden-shifting framework. However, the Sixth Circuit has stated that "[t]he 'rubber-stamp' or 'cat's paw' theory of liability . . . is more appropriately dealt with in circumstantial evidence review." Johnson v, Metropolitan Govt. of Nashville, 502 Fed. Appx. 523 (6th Cir. 2012); see, Reynolds v. Federal Exp. Corp., 2012 WL 1107834 at *16 (W.D. Tenn. Mar. 31, 2012 ("the cat's paw theory of liability . . . applies to cases of both direct and circumstantial evidence."

Furthermore, "'the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met,'" A.C. *ex rel.* J.C. v. Shelby County Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013) (citation omitted), and the EEOC has met it burden in this case. As such, the burden of production shifts to Gregg to articulate a legitimate non-discriminatory reason for Keen's termination which it does by asserting that she performed her job poorly. See, Stockeman v. Oakcrest Dental Ctr. P.C., 480 F.3d 791, 802 (6th Cir. 2007) ("Poor performance is a legitimate non-discriminatory reason for terminating an employ."). Accordingly, the burden reverts back to the

12

EEOC to show that this purported reason for Keen's termination was but a pretext for retaliation.

Pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these avenues of proof, the Sixth Circuit has stated:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994); accord, Pennington v. Western Atlas, Inc., 202 F.3d 902 909-10 (6th Cir. 2000).

The EEOC has presented more than sufficient evidence to cast doubt on Gregg's explanation for Keen's termination, and it will be for the jury to sort out the true reasons Keen was let go.

The Sixth Circuit "has adopted an 'honest belief' rule with regard to an employer's proffered reason for discharging an employee" which holds that, "as long as an employer has an honest belief

13

in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001). "The key inquiry in assessing whether an employer holds such an honest belief is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." Michael v. Caterpillar Finan. Serv. Corp., 496 F.3d 584, 598, 599 (6th Cir. 2007). While the employer's decisional process need not be "optimal," nor is the employer required to leave "no stone unturned," id., there was no investigation in this case – the purported decisionmaker Bush, did not even talk with Sundwall, but she did talk with Skinner.

Additionally, the whole timing of events may be viewed by a jury to be suspicious. "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext,'" but "'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" Seeger v. Cincinnati Bell Tele. Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012) (citations omitted). Here, days after Skinner was instructed by Bush to terminate Adams, he transferred Sundwall (who Skinner promoted to General Manager) into a position supervising Keen, and just days later Keen received her first written corrective action. Things then continued to proceed south, with Skinner ultimately telling Sundwall to submit the matter to Bush (thereby escalating the situation), Bush accepting what she was informed by email from Sundwall, Bush conversing with Skinner but not Sundwall, and Bush terminating Keen purportedly based only upon the reason given by Sundwall.

Finally, the differing treatment of comparable employees may give rise to an inference of retaliation. See, Manzer, 29 F.3d at 1084. In this regard, the EEOC points to the treatment

14

McCorkle received.

Like Keen, McCorkle was a manager directly supervised by Sundwall, and he, too, received a large number of write-ups during a very short period. However, unlike Keen, McCorkle did not claim he had been harassed or discriminated against, and, unlike Keen, he was not let go or even given a final written warning. See, Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir.2006) (plaintiff "was not required to demonstrate an exact correlation between himself and others similarly situated; rather, he had to show only that he and his proposed comparators were similar in all relevant respects"); Johnson v. Kroger Co. 319 F.3d 858, 867 (6th Cir. 2003) ("In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct.")

"'Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" Chen v. Dow Chemical Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." Id. The EEOC has, in fact, cast doubt on Gregg's explanation for Keen's termination, and it will be for the jury to decide whether the proffered reason was truthful, or whether it was a pretext to retaliate against Keen for lodging a sexual harassment complaint against Adams.

## IV. CONCLUSION

Based upon the foregoing, the Court will enter an Order denying Gregg's Motion for

15

Summary Judgment.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE