**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:10 C 00861 |
| v. | ) | Judge Marvin E. Aspen |
| | ) | |
| GREGG APPLIANCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for a new trial filed by Plaintiff Equal Employment
Opportunity Commission ("EEOC"). Generally speaking, EEOC contends that certain jury
instructions and evidentiary issues were prejudicial and that the jury's verdict, in favor of
Defendant Gregg Appliances, Inc. ("Gregg"), was contrary to the weight of evidence presented
at trial. As set forth below, we deny the motion.

## BACKGROUND

By way of overview, EEOC sued Gregg in 2010, alleging that Gregg retaliated against a
former employee, Courtney Keen,[1] in violation of Title VII of the Civil Rights Act of 1964.
Keen worked at Gregg's Murfreesboro store as office manager for about two years until she was
promoted into the management-in-training program on January 21, 2008. After successfully
completing that program, Keen became an assistant manager at the Murfreesboro location. At
that time, her general manager was Mike Adams, and the district manager was Matt Skinner.

---

[1] Keen has since married and changed her surname, but we refer to her as "Keen" for ease of
reference, as have the parties.

On December 22, 2008, Keen reported to Skinner that Adams had been sending her sexually harassing text messages. Gregg investigated, and Skinner promptly fired Adams on December 23, 2008. Gregg replaced Adams with Ken Sundwall on December 29, 2008. Beginning on January 3, 2009, Sundwall issued Keen fourteen corrective action reports ("CARs") in less than four months. Gregg terminated Keen's employment on April 16, 2009.

This case was tried to a jury from March 31, 2015 through April 3, 2015. Keen testified, as did Skinner, Sundwall, and Gregg's employee relations specialist, Cynthia Bush. The jury also heard from two of Keen's coworkers, Ronald Fritz and James Cunningham. While we assume familiarity with the facts and procedural history underlying this motion, we summarize below the primary evidence presented to the jury.

## A.     EEOC's Case

At trial, EEOC presented evidence that Keen's career with Gregg was successful and progressing until the company replaced Adams with Sundwall in December 2008. Keen received positive evaluations each year from 2004 through 2008 and was repeatedly promoted. (*See* 3/31/15 Tr. (Keen) at 104–08 (Dkt. No. 244); 3/31/15 Tr. (Skinner) at 54.) While she was an office manager and manager-in-training, she assisted with training employees at various locations and also represented Gregg at job fairs. (3/31/15 Tr. (Keen) at 99–101, 103.) Prior to her complaint of harassment, Keen had not received any discipline, for any reason. (*Id.* at 117.)

Fritz and Cunningham, though not her supervisors, testified that Keen was a good worker, upon whom the managers and staff relied. (4/1/15 Tr. (Fritz) at 75–78 (Dkt. No. 245); 4/1/15 Tr. (Cunningham) at 90.) They further stated that Skinner and Adams were friends and that Skinner became emotional upon terminating Adams. (4/1/15 Tr. (Fritz) at 78–79; 4/1/15 Tr. (Cunningham) at 92–94 (testifying that the two men embraced and that Skinner wiped

his eyes).)  They testified that Adams returned to the store the day after his termination to fry turkeys at the store's Christmas party, which Skinner also attended.  (4/1/15 Tr. (Fritz) at 79; 4/1/15 Tr. (Cunningham) at 94–95; *see also* 3/31/15 Tr. (Skinner) at 35–36); 3/31/15 Tr. (Keen) at 114–15 (testifying that Skinner gave her the day off even though she had not requested it).)

Fritz and Cunningham also both testified that they were aware, due to gossip at the store, that Gregg terminated Adams because of Keen's complaint of sexual harassment.  (4/1/15 Tr. (Fritz) at 78; 4/1/15 Tr. (Cunningham) at 100–101.)  Keen relatedly testified that, after Adams' termination, another manager confided that he knew what had happened but that everything would be fine.  (3/31/15 Tr. (Keen) at 115–16.)  She also heard rumors that Adams' sons made threatening comments about her at other Gregg locations.  (4/1/15 Tr. (Keen) at 69–70.)

In early January 2009, Skinner specifically assigned Keen the task of ensuring that all blaster tags[2] throughout the store were posted and accurate, although this job was typically performed by customer service or sales staff.  (3/31/15 Tr. (Skinner) at 42–43; 4/1/15 Tr. (Keen) at 36–37.)  On January 3, 2009, Sundwall issued Keen her first discipline (a counseling), for failure to maintain blaster tags.  (4/1/15 Tr. (Keen) at 36; *see* Joint Ex. 13.)  Shortly thereafter, Keen received three additional CARs—including a written warning and a final warning—based on failure to maintain blaster tags.  (Joint Exs. 14, 17, 19.)  These CARs indicated that failure to complete her assigned tasks, despite instructions from supervisors, would be deemed insubordination and future disregard would result in additional discipline, up to and including termination.  (*See, e.g.*, Joint Exs. 14, 17, 19.)

---

[2] Blaster tags are smaller price tags for accessories that are attached to a peg hook, and the store had at least one hundred such tags.  (3/31/15 Tr. (Skinner) at 71; 4/1/15 Tr. (Keen) at 12; 4/1/15 Tr. (Fritz) at 81–83; *see also* 4/1/15 Tr. (Stip.) at 112 (stipulating that a typical Gregg store "might have 400 to 500 items with [b]laster tags").)

Sundwall also disciplined Keen for additional deficiencies. He issued several CARs based on Keen's failure to complete Gregg's checklists and to prepare the store for the new weekly deals advertised on Sundays. (Joint Exs. 15–16.) He reprimanded Keen on two occasions for failing to adequately prepare the store at closing and prior to a private sale. (Joint Exs. 18, 23.) Sundwall verbally counseled Keen on February 9, 2009, admonishing her to keep all discipline confidential and not discuss it with staff. (Joint Ex. 22.) Keen received two more CARs: for her behavior while designated by Sundwall as the point manager, and for her failure to meet personal monthly sales goals. (Joint Exs. 24–25.)

By March 6, 2009, Sundwall decided to reach out to Skinner concerning Keen's disciplinary problems. (Joint Ex. 27; 4/1/15 Tr. (Sundwall) at 141–43; *see* 4/2/15 Tr. (Bush) at 18–19 (Dkt. No. 246).) Skinner, in turn, contacted Bush for her to determine the next appropriate step. (Joint Exs. 26–28.) Bush reviewed and revised a CAR drafted by Sundwall to serve as a final warning and to place Keen on a thirty-day performance improvement plan ("PIP"). (Joint Exs. 28–29; *see also* 4/2/15 Tr. (Bush) at 20–23.) After incorporating Bush's edits, Sundwall delivered the PIP on March 14, 2009. (Joint Ex. 30.)

While on her PIP, Keen received an additional written warning concerning blaster tags on April 11, 2009. (Joint Ex. 32.) Although Sundwall disciplined Keen for failing to put out the tags, she testified that the tags were a duplicate set that did not need to be distributed. (4/1/15 Tr. (Keen) at 17.) Sundwall informed Bush about this deficiency, as well as other problems he noted during the PIP period. (Gregg Exs. 51–52.) By email, Sundwall sought guidance from Bush as to how to proceed given the continuing problems with Keen. (Gregg Ex. 52; 4/2/15 Tr. (Bush) at 23–28.) Bush requested additional information from Sundwall by email and then spoke with Skinner. (Gregg Ex. 52; 4/2/15 Tr. (Bush) at 23–28.)

Based exclusively on her conversations with Skinner and review of the CAR documentation, Bush decided that Gregg would terminate Keen. (4/2/15 Tr. (Bush) at 28–29, 57–58.) In reaching that conclusion, Bush did not conduct any additional investigation, nor did she speak with either Sundwall or Keen. (*Id.* at 54–55, 58; *see also* 4/1/15 Tr. (Sundwall) at 164; 4/1/15 Tr. (Stip.) at 111.) Bush acknowledged that Keen's personnel file, kept in Indianapolis per Gregg policy, did not include evaluations for 2006, 2007, or 2008. She admitted that the absence of those records was abnormal and that she did not attempt to find them while considering Keen's 2009 disciplinary history. (4/2/15 Tr. (Bush) at 38–41.) Bush also did not ask anyone about Keen's performance during those years, confining her review to the issues presented to her by Sundwall and Skinner. (*Id.* at 40.) For her part, Bush requested information from Skinner about how Gregg had handled similar deficiencies in other local assistant managers, for comparison purposes. (*Id.* at 40–41; Gregg Ex. 52.)

Although Bush had recommended demoting another employee with disciplinary issues, she did not suggest demoting or transferring Keen. (4/2/15 Tr. (Bush) at 53–54.) Indeed, Keen testified that she was not offered a transfer out of the Murfreesboro store. (3/31/15 Tr. (Keen) at 121.) Based on Bush's decision, Skinner terminated Keen's employment for poor performance on April 16, 2009. (Joint Ex. 33.)

In addition to the evidence about Keen's disciplinary history and Gregg's decision-making process, EEOC introduced evidence of Sundwall's allegedly preferential treatment of three male Gregg employees who had not complained of sexual harassment. For example, Sundwall issued eleven CARs in quick succession to David McCorkle, a sales manager, for cash handling problems, leaving early, and failing to follow instructions. (*See* Joint Exs. 10–21; 4/1/15 Tr. (Stip.) at 112–13.) Yet Gregg did not terminate McCorkle's employment. (3/31/15

Tr. (Skinner) at 87–92; 4/1/15 Tr. (Sundwall) at 121–26, 172.)  Eric Goward, also a sales manager, received at least two CARs from Sundwall due to cash shortages and excessive shink (that is, external or internal theft).  Gregg did not fire Goward until he failed to lock the store doors, resulting in the loss of two televisions.  (4/1/15 Tr. (Sundwall) at 165–72; *see* Joint Exs. 57–58.)  EEOC also highlighted the treatment of Antonio McLamb, who received only counseling for his store's loss of $5000 worth of product and for leaving his shift early without permission.  (4/1/15 Tr. (Sundwall) at 171–73; *see* Joint Exs. 60, 62.)

Based on this evidence, EEOC argued several related theories before the jury.  (*See, e.g.*, 4/2/15 Tr. (EEOC closing) at 91–96, 98–99.)  EEOC contended that Skinner—in retaliation for Keen's complaint about his friend, Adams—deliberately sent Sundwall to Keen's store, knowing that Sundwall, a perfectionist, would create the disciplinary paper trail needed to fire her.  Moreover, Skinner specifically tasked her with managing the blaster tags in the store, a tall order.  EEOC also argued that Sundwall intentionally retaliated against Keen, because he, along with others within Gregg (like Fritz and Cunningham), knew that her complaint led to Adam's termination.  Calling upon the "cat's paw" theory, EEOC further argued that Bush essentially rubber-stamped the unlawful firing of Keen by relying exclusively on the information provided by Sundwall and Skinner, who themselves acted with a retaliatory motive.  EEOC also emphasized the suspicious timing of this series of events.  Thanks to Skinner and Sundwall, Keen received more than a dozen CARs within just a few weeks after her complaint about Adams, and yet Bush, who had investigated Keen's harassment claim, did not question the scenario or undertake any investigation.  (*See, e.g.*, 4/2/15 Tr. (Bush) at 60–63 (testifying that it "didn't raise any red flags" for her that Keen received thirteen CARs in less than four months following the harassment complaint).)

### B.     Gregg's Defense

In its defense, Gregg presented additional evidence in its attempts to undermine EEOC's theories.  As to the blaster tag assignment, for example, Skinner testified that Keen was not required to personally maintain the tags.  According to Skinner, Keen was free to delegate that task to staff but would be held responsible ultimately for its completion as a leader in the store.  (3/31/15 Tr. (Skinner) at 42–43, 81–82, 84–85.)

As to alleged discriminatory intent, Skinner testified that he was merely colleagues with Adams.  Contrary to the accounts of Fritz and Cunningham, Skinner testified that he did not cry at Adams' termination or sit in his car to compose himself.  (3/31/15 Tr. (Skinner) at 33–34, 66–67, 92.)  Skinner further stated that he believed Adams' termination was warranted.  (*Id.* at 33, 79.)

Skinner, moreover, insisted that he did not retaliate against Keen or bring Sundwall into the Murfreesboro store to do so for him.  (*Id.* at 80.)  Rather, Sundwall is a perfectionist by nature whose "specialty" was to bring wayward stores and managers back in line with corporate policy and expectations.  (3/31/15 Tr. (Skinner) at 93; 4/1/15 Tr. (Sundwall) at 116–17.)  Indeed, Sundwall testified that prompt and consistent discipline is important to correct behaviors so that managers can improve for their own benefits, as well as for the benefits of the company and its customers.  (4/1/15 Tr. (Sundwall) at 117–19; *see also id.* at 152 (stating that he issues a lot of CARs to develop his employees and improve the store).)  Gregg witnesses testified that Skinner was not involved in Sundwall's decision to discipline employees, unless and until it escalated to a final warning.  (*Id.* at 119; 3/31/15 Tr. (Skinner) at 42, 47–49, 77; 4/2/15 Tr. (Bush) at 7–8.)

For his part, Sundwall explained that his discipline of Keen was based solely on her performance and her failure to improve.  With respect to checklists, for example, Sundwall and

Skinner—unlike Adams—expected Keen to fully and consistently complete them in compliance with Gregg policy.  (3/31/15 Tr. (Skinner) at 68–69; 3/31/15 Tr. (Keen) at 109–110; 4/1/15 Tr. (Sundwall) at 136–37 (testifying that checklists were mandatory "across the board").)  Keen acknowledged that this expectation was fair, yet failed to meet it.  (4/1/15 Tr. (Keen) at 43–44; *see* 4/1/15 Tr. (Sundwall) at 136–38.)  In response to the CARs issued by Sundwall, Keen was nonchalant, disengaged, and would roll her eyes.  (4/1/15 Tr. (Sundwall) at 134–35, 137, 139, 141, 145, 150, 164.)  She showed no willingness or interest in improving, and she made no progress.  (*Id.* at 135, 137–39, 141, 145, 150, 153, 164.)  Sundwall did not make the decision, or participate in the decision, to terminate Keen's employment.  (*Id.* at 149–50).

Sundwall also testified that he did not know that Keen had complained of sexual harassment at any time prior to the litigation.  (*Id.* at 126–28, 151–52.)  He stated that, even though he worked with Adams' son at the Cool Springs location, he never asked why Gregg had fired Adams.  (*Id.* at 160).  Nor was he friends with Adams.  (*Id.* at 127.)  Skinner corroborated, testifying that he did not tell Sundwall why Adams had left Gregg.  (3/31/15 Tr. (Skinner) at 77–78.)  Bush similarly testified that she had not discussed Adams' termination with Sundwall.  (4/2/15 Tr. (Bush) at 32.)

Skinner and Sundwall testified that they offered Keen a demotion to an operations supervisor position at another location, as she had excelled in that type of position.  Sundwall spoke with Keen about that possibility, and she rejected the idea.  (4/1/15 Tr. (Sundwall) at 146; 3/31/15 Tr. (Skinner) at 53–55, 78–79.)

As to the decision to terminate Keen, Bush testified that she alone made that call, without recommendation from Sundwall or Skinner.  (4/2/15 Tr. (Bush) at 29–30; *see also* 3/31/15 Tr. (Skinner) at 53; 4/1/15 Tr. (Sundwall) at 164.)  Bush stated that she was the only person at Gregg

with the authority to make that decision. (4/2/15 Tr. (Bush) at 30.) Bush testified that, when

considering whether to fire Keen, she felt she had all the necessary information based on the

documentation and additional information provided by Skinner about other managers. (*Id.*

at 24–29, 56–61.) She stated that she did not question Skinner's motives, or Keen's discipline,

under the circumstances. (*Id.* at 61–64.)

As Gregg emphasized, Keen herself did not appear to question the sudden imposition and

escalation of discipline. Gregg witnesses testified that Keen did not complain about the write-

ups, even though she knew how to do so and had raised prior complaints with success.[3] (*See*

3/31/15 Tr. (Skinner) at 82–83; 4/2/15 Tr. (Bush) at 29, 32–33, 66; *see also* 4/1/15 Tr. (Keen)

at 33–35, 42–43, 45–46, 53, 57, 64–65.) According to Gregg, Keen's silence revealed that she

did not perceive the discipline as retaliatory. For her part, however, Keen testified that she was

afraid to complain because she needed her job to provide for her family and she feared that

complaining would aggravate the situation. (4/1/15 Tr. (Keen) at 6–7.)

Finally, Gregg encouraged the jury to question EEOC's comparisons of Keen to other

employees, particularly McCorkle and Goward. For example, although McCorkle received

eleven CARs from Sundwall for similar problems at another store, Sundwall then left to take

over the Murfreesboro location after Adams' termination. Gregg suggested that the only

difference between Keen and McCorkle is that McCorkle got lucky that Sundwall left. (4/1/15

Tr. (Sundwall) at 122–24, 126; 4/2/15 Tr. (Gregg closing) at 111.) Sundwall also testified that

some of McCorkle's CARs were based on store deficiencies, rather than his personal

deficiencies. (4/1/15 Tr. (Sundwall) at 123–24.) In addition, unlike Keen, McCorkle was

---

[3] The parties disputed the admissibility of this evidence prior to trial. By order dated
March 31, 2015, we permitted Gregg to introduce this evidence (i.e., that Keen made no
complaints about the discipline) so long as it did not suggest that Keen was required to do so.
(3/31/15 Order at 3 (Dkt. No. 239).) We also issued a limiting instruction to the jury on this
point specifically. (*See* Marked Jury Instr. at 13 ("No Requirement of Internal Complaint").)

receptive to discipline, discussed his opportunities, and seemed earnest in his efforts.  (*Id.* at

123.)  Relatedly, Sundwall testified that the CARs he issued to Goward were not comparable in

either number or severity.  (*Id.* at 181–82.)  In fact, the write-ups for Goward were based on

issues at the store on the whole, rather than individual behavior.  (*Id.* at 182.)  Goward, too, was

receptive to Sundwall's comments, unlike Keen.  (*Id.*)

Based on this evidence, Gregg argued to the jury that no one at Gregg had any retaliatory

motive in disciplining and firing Keen.  Gregg argued that Skinner had been supportive of Keen

in the past, including with promotions and prior complaints, and he had no personal vendetta

against her.  As for Sundwall, he did not know that Keen had complained about Adams and was

merely a strict general manager acting to bring the Murfreesboro store back into alignment with

corporate expectations.  According to Gregg, Bush had no reason to question the input she

received from Skinner or Sundwall and alone made the decision to terminate Keen's

employment, without any animus.

## STANDARD OF REVIEW

With that background in mind, we turn to EEOC's motion.  Rule 59 authorizes us to

"grant a new trial on all or some issues," and as to any party, at our discretion.  Fed. R. Civ.

P. 59(a); *see EEOC v. New Breed Logistics*, 783 F.3d 1057, 1065–66 (6th Cir. 2015); *Doe v.

Rutherford Cty., Tenn. Bd. of Educ.*, — F. Supp. 3d —, 2015 WL 475414, at *3 (M.D. Tenn.

Feb. 4, 2015).  As explained by the Sixth Circuit, a new trial under Rule 59 is warranted only

"when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being

against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair

to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias."

*New Breed Logistics*, 783 F.3d at 1066 (internal quotation omitted); *Balsley v. LFP, Inc.*,

691 F.3d 747, 761 (6th Cir. 2012); *Jones v. Nissan N. Am., Inc.*, 438 F. App'x 388, 396–97 (6th Cir. 2011); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006). The "governing principle" in our consideration of a Rule 59 motion "is whether . . . such course is required in order to prevent an injustice." *Park West Galleries, Inc. v. Hochman*, 692 F.3d 539, 544 (6th Cir. 2012) (internal quotation omitted). The moving party bears the burden of proving that a new trial is necessary. *See Crouch v. W. Exp., Inc.*, 11 C 1094456, 2014 WL 1094456, at *6 (M.D. Tenn. Mar. 19, 2014); *Mathis v. Wayne Cty. Bd. of Educ.*, No. 09 C 34, 2011 WL 3320966, at *5 (M.D. Tenn. Aug. 2, 2011).

## ANALYSIS

EEOC raises several types of arguments in its motion, and we address each in turn below. We begin with EEOC's sufficiency of the evidence argument and will then turn to EEOC's challenges based on certain jury instructions and evidentiary issues.

### A.      Challenge to the Verdict as against the Weight of the Evidence

EEOC contends that the jury's verdict was against the clear weight of the evidence. In analyzing this argument, we "may compare the opposing proofs and weigh the evidence." *Conte v. Gen'l Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000); *Crouch*, 2014 WL 1094456, at *6; *Mathis*, 2011 WL 3320966, at *5. Nonetheless, courts are not at liberty to "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Jones*, 438 F. App'x at 396–97 (quoting *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000)); *see New Breed Logistics*, 783 F.3d at 1066; *EEOC v. Finish Line, Inc.*, 940 F. Supp. 2d 777, 784 (M.D. Tenn. 2013). In other words, we must deny a motion for a new trial as long as a reasonable juror could have reached the verdict under review—even if we might

have reached a different conclusion had we acted as the finder of fact at trial. *Jones*, 438 F.

App'x at 396–97; *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008); *Barnes*,

201 F.3d at 821; *Mathis*, 2011 WL 3320966, at *5.

Considering and comparing all of the evidence at trial, we cannot conclude that no

reasonable juror could have found for Gregg. *New Breed Logistics*, 783 F.3d at 1066; *Jones*, 438

F. App'x at 396–97. Quite frankly, it was a very close case. The jury easily could have been

persuaded by EEOC's circumstantial evidence, particularly as to the highly suspicious timing of

events and allegedly preferential treatment of McCorkle. But the jury could have been swayed

just as reasonably by Gregg's evidence, based largely on direct testimony, that Skinner harbored

no ill-will toward Keen and that Sundwall was an unbiased taskmaster. The evidence required

the jury to make credibility findings and weigh the conflicting evidence in rendering a verdict.

Sundwall, for example, was a particularly serious witness, whose demeanor was entirely

consistent with the portrayal of him as a disciplinarian. Keen, on the other hand, testified

generally that the CARs were "very inaccurate" but provided little evidence—even within her

own testimony—to back up that assertion. (*See* 3/31/15 Tr. (Keen) at 119; 4/1/15 Tr. (Keen)

at 37–38, 42–45, 47–53, 60–62 (testifying that she could not recall details about the identified

performance problems and could not remember what dates she alleged that she might have been

off work).) Ultimately, the jury believed Gregg and rejected EEOC's various theories, and there

was sufficient evidence for them to do so. Even if we might have reached a different conclusion,

we must accept the jury's verdict under these circumstances. *Jones*, 438 F. App'x at 396–97;

*Taylor*, 517 F.3d at 383; *Barnes*, 201 F.3d at 821; *Mathis*, 2011 WL 3320966, at *5.

**B.**     **Challenges to Jury Instructions**

We next consider EEOC's challenges to two particular jury instructions.  EEOC contends that we erred at trial because we: (1) issued an instruction addressing the jury's assessment of employees who were similarly-situated to Keen; and (2) refused to issue a spoliation instruction.  When evaluating such arguments, our standard of review depends on whether EEOC properly objected to the use or rejection of an instruction.  *EEOC v. New Breed Logistics*, 962 F. Supp. 2d 1001, 1008 (W.D. Tenn. 2013); Fed. R. Civ. P. 51(d).

Pursuant to Rule 51(d), we review post-trial challenges to jury instructions for plain error, unless the moving party objected during trial.  Fed. R. Civ. P. 51(b)–(d).  "In the Sixth Circuit, to preserve objections to jury instructions, a party must not only object prior to the court's charge to the jury, it must renew those objections after the jury receives its instructions."  *New Breed Logistics*, 962 F. Supp. 2d at 1008; *Scott v. Miller*, 631 F. App'x 650, 653 (6th Cir. 2010) ("The law in this circuit generally requires a formal objection, which should in most circumstances be made both before and after the jury instructions are read to the jury."); *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 547–48 (6th Cir. 1995).  In addition to the timing requirement, parties must object substantively on the record, "stating distinctly the matter objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  Accordingly, general or vague objections raised at the trial level are insufficient and result in waiver of the argument. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405–06 (6th Cir. 2013) (stating that "imprecise objections will not preserve the matter for appeal"); *Fischer v. United Parcel Serv., Inc.*, 90 F. App'x 802, 808 (6th Cir. 2004) (same); *Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1993) (explaining that "objections must be sufficiently specific to enable the trial court to follow them if well taken").

When reviewing for plain error, we consider whether "as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 527–28 (6th Cir. 2012) (internal quotation omitted); *see also Armstrong v. Shirvell*, 596 F. App'x 433, 451 (6th Cir. 2015); *Luna v. Bell*, 11 C 93, 2013 WL 5592194, at *3 (M.D. Tenn. Oct. 10, 2013). Under this standard, a new trial is necessary if the challenged instruction renders the set of instructions, as a whole, misleading, legally inadequate, or confusing. *New Breed Logistics*, 783 F.3d at 1074–75; *Crouch*, 2014 WL 1094456, at *8; *Luna*, 2013 WL 5592194, at *3. For us to order a new trial, the error must be both "obvious and prejudicial." *Bonkowski v. Allstate Ins. Co.*, 544 F. App'x 597, 608–09 (6th Cir. 2013) (further stating that harmless errors "will not furnish a basis for relief"); *Armstrong*, 596 F. App'x at 451; *New Breed Logistics*, 783 F.3d at 1074–75; *Luna*, 2013 WL 5592194, at *3. With these principles in mind, we turn to EEOC's arguments.

### 1.      Instruction as to Similarly-Situated Gregg Employees

As evidence of Gregg's intentional discrimination, EEOC argued at trial that similarly-situated employees, who had not engaged in protected activity, were treated better than Keen. As mentioned earlier, EEOC presented evidence that three male Gregg employees—McCorkle, Goward, and McLamb—received numerous write-ups from Sundwall yet were not punished similarly.[4]

At trial, we delivered Gregg's proposed instruction addressing EEOC's reliance on this evidence of similarly-situated employees. (Marked Jury Instr. at 8–9 (Dkt. No. 250).) Gregg submitted this proposal prior to trial, (Dkt. No. 195), and EEOC did not propose any similar instruction (Dkt. No. 202). Although EEOC objected in writing prior to trial as to several

---

[4] EEOC also introduced some evidence about another comparator, Scott Rudy, but it has not relied on Gregg's treatment of Rudy as part of its motion. (*See, e.g.*, 4/1/15 Tr. (Sundwall) at 169–71.)

instructions proposed by Gregg, it did not object to the similarly-situated instruction. (Dkt. No. 211.)

Moreover, EEOC did not alert us during the trial proceedings that it contested the inclusion of the instruction or its specific language. At best, we might have assumed that EEOC did not feel such an instruction was necessary, because it had not proposed anything similar.[5] To the contrary, however, EEOC asserted at the pretrial conference that the parties "still do need the instruction," after we had suggested withdrawing it entirely. (3/30/15 Pretrial Conf. Tr. at 20–22 (proposing to pull the instruction because the identified comparators were not testifying personally) (Dkt. No. 270).) In short, EEOC raised no express objection to this instruction, either before or after the jury charge.[6] Fed. R. Civ. P. 51(c)(1) (requiring a distinct objection with articulated grounds). Accordingly, we review the instruction for plain error.

The instruction, as given to the jury, stated:

One way EEOC can prove that Keen's complaint was a determining factor in its decisions to discipline and discharge her is by offering evidence that Gregg treated Keen differently than "similarly situated" employees who did not engage in protected activity. For these comparisons to be legally sufficient, the employees with whom EEOC seeks to compare Keen must be "similarly situated" to her in all relevant respects. To be "similarly situated," the employees must have:
1.     dealt with the same supervisor as Keen;
2.     been subject to the same standards as Keen; and
3.     engaged in the same conduct as Keen without such differentiating or mitigating circumstances that would distinguish their conduct or Gregg's treatment of them for it.

_____

[5] Even if EEOC had proposed a competing similarly-situated instruction, that submission would "not suffice to put the Court on notice that a party maintains objections when that party fails to object." *New Breed Logistics*, 962 F. Supp. 2d at 1009; *Semrau*, 693 F.3d at 527 ("Merely proposing a jury instruction is insufficient to preserve an objection.").
[6] Although we informed the parties that they need not reiterate objections to the instructions to preserve their record, our statement plainly referred only to objections previously made. (4/1/15 Tr. at 184; 4/2/15 Tr. at 81; *see also* 3/30/15 Tr. at 22 ("[O]nce you've objected to something, you've made your record and we don't have to reargue things we've argued before, unless there's been a change in the evidence or the evidence shows that a particular instruction should or should not be given.").) EEOC never objected to this instruction in the first instance.

So, an employee who supervised Keen or an employee who reported to a different supervisor than Keen cannot be similarly situated to Keen.

EEOC does not have to demonstrate an exact correlation with the employees receiving more favorable treatment than Keen. The employees need only be similar in all relevant respects. If EEOC shows by a preponderance of the evidence that Keen was treated differently than a similarly situated employee, you may consider that evidence in your consideration of whether Keen's complaint was a determining factor in Gregg's decision to discipline and discharge her. If EEOC does not show by a preponderance of the evidence that Keen was treated differently than a similarly situated employee, then you may not consider that evidence in your consideration of the retaliation claim.

(Marked Jury Instr. at 8.)

EEOC argues that this instruction was confusing for the jury because it seems to suggest that Keen's comparators must have committed literally "the same conduct" as Keen in order to be considered similarly-situated. (EEOC Mem. at 7.) According to EEOC, the jury discounted the testimony about McCorkle, Goward, and McLamb because Sundwall had not written them up for "the same conduct," i.e., for failing to maintain blaster tags. EEOC further contends that the disputed language is not required by the Sixth Circuit, which has held that comparators need only engage in "acts of comparable seriousness," rather than "the same conduct," to be considered similarly-situated. (*Id.* at 6–7 (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).)

In reviewing the instructions on the whole, we conclude that use of the similarly-situated instruction did not constitute plain error. EEOC's arguments focus narrowly on the "same conduct" language but ignore the rest of the instruction. In its entirety, that sentence explains that comparators must have "engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or Gregg's treatment of them for it*." This additional clause informs the jury that it should consider surrounding circumstances when evaluating the conduct. Perhaps more importantly, the instruction explicitly told the jury

that "an exact correlation" was not required and that the other "employees need only be similar in all relevant respects" to be deemed similarly situated to Keen. Keeping the "same conduct" language in context, the instruction should not have mislead the jury into believing that only employees with numerous blaster tag violations could be found similarly situated.

The "same conduct" language, moreover, was taken from Sixth Circuit authority. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Although the "comparable seriousness" language has also been endorsed, the "same conduct" formulation has appeared in numerous cases and has not been rejected by the Sixth Circuit.[7] *Summerfield v. Gorniak*, 560 F. App'x 571, 572–73 (6th Cir. 2014); *Ortiz v. Hershey Co.*, 580 F. App'x 352, 356 (6th Cir. 2014); *Arnold v. City of Columbus*, 515 F. App'x 524, 532 (6th Cir. 2013); *Ayers-Jennings v. Fred's Inc.*, 461 F. App'x 472, 476–77 (6th Cir. 2012); *Carson v. Patterson Cos., Inc.*, 423 F. App'x 510, 513 (6th Cir. 2011); *see also Hawkins v. Center for Spinal Surgery*, 34 F. Supp. 3d 822, 839 (M.D. Tenn. 2014); *Hajizadeh v. Vanderbilt Univ.*, 879 F. Supp. 2d 910, 927 (M.D. Tenn. 2012). We cannot find that we committed plain error by reciting a formulation commonly and currently used by the Sixth Circuit. *See Layman v. Alloway Stamping & Mach. Co.*, 98 F. App'x 369, 373 (6th Cir. 2004) (concluding that "[b]ecause the district court relied upon clearly established Sixth Circuit precedent, the jury instructions do not constitute plain error"); *New Breed Logistics*, 962 F. Supp. 2d at 1013 (refusing to find error in a retaliation instruction that tracked the Sixth Circuit's articulation).

---

[7] EEOC's reference on this point to *McDole v. City of Saginaw*, 471 F. App'x 464, 474–76 (6th Cir. 2012), is unavailing. (EEOC Mem. at 6.) In *McDole*, the Sixth Circuit stated repeatedly that district courts are not required to issue a similarly situated jury instruction. 471 F. App'x at 475. The court also noted that it has approved jury instructions that did not include a similarly situated component. In its discussion, however, the Sixth Circuit did not indicate (let alone hold) that district courts should no longer give a similarly situated instruction if requested and appropriate under the circumstances. *Id.* at 475–76.

EEOC contends that the jury either ignored or misunderstood this instruction, because it found in favor of Gregg.  (Mem. at 7–8.)  To the contrary, we presume that "juries 'follow their instructions.'"  *Esparza v. Sheldon*, 765 F.3d 615, 623 (6th Cir. 2014) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709) (1987)); *United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013).  EEOC has not offered any evidence to suggest that this presumption should not apply, other than the fact that it disagrees with the jury's verdict.  *Esparza*, 765 F.3d at 623; *Lawrence*, 735 F.3d at 403.  EEOC's argument overlooks the very real possibility that the jury understood the instruction but simply was not persuaded by EEOC's evidence.  For example, the evidence showed that the comparators responded positively to Sundwall's criticisms, while Keen did not.  That fact alone could have swayed the jury, even if the comparators' disciplinary records had been identical.  In sum, we find that use of the instruction does not rise to the level of plain error.  *Bonkowski*, 544 F. App'x at 608–09; *Armstrong*, 596 F. App'x at 451; *Luna*, 2013 WL 5592194, at *3.

2.      **Instruction as to Spoliation**

EEOC next argues that our failure to provide its requested spoliation instruction necessitates a new trial.  (Mem. at 11–13.)  Prior to trial, EEOC proposed inclusion of the following instruction:

> Imposing an adverse inference from the fact that evidence is missing is a generally accepted principle of law.  When documents are relevant to an issue in the case, the jury may infer that the party which has prevented production of those documents did so out of the well-founded fear that the contents of that document would be harmful.  In this case, Gregg has failed to provide the annual performance evaluations for Ms. Keen for the years 2005-2008.  Thus, you may infer that those evaluations would have supported the Plaintiff's case.

(EEOC's Proposed Instr. (Dkt. No. 202) at 13.)  Gregg objected to this proposed instruction as unwarranted by the evidence, which would not establish that the documents existed or had been

destroyed after it had knowledge of Keen's underlying EEOC charge. (Dkt. No. 210 at 6.)

On March 31, 2015, we handed the parties the working set of instructions that we intended to

give the jury. (*See, e.g.*, 4/1/15 Tr. at 183–84.) Based on Gregg's objection, we omitted the

instruction from that preliminary set and did not charge the jury as to spoliation after the close of

evidence. EEOC did not contest the exclusion of the spoliation instruction during the final

instruction conference held on April 1, 2015, (*see, e.g.*, 4/1/15 Tr. at 81–86), or at any other time.

Our rejection of the spoliation instruction "constitutes reversible error if (1) the omitted

instruction is a correct statement of the law; (2) the instruction is not substantially covered by

other delivered charges; and (3) the failure to give the instruction impairs the requesting party's

theory of the case." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007);

*Decker v. GE Healthcare Inc.*, 770 F.3d 378, 396–97 (6th Cir. 2014); *Bluedorn v. Wojnarek*,

07 C 839, 2009 WL 2252266, at *4–5 (M.D. Tenn. July 27, 2009). That being said, it would

also be erroneous "to instruct the jury on an issue where there has been insufficient evidence

present to support a jury finding on that issue." *Tuttle*, 474 F.3d at 322 (internal quotation

omitted). The rejection of an instruction falls within our discretion, such that a new trial would

be appropriate "only if the instructions, viewed as a whole, were confusing, misleading, or

prejudicial." *Fencorp. Co. v. Ohio Ky. Oil Corp.*, 675 F.3d 933, 941–43 (6th Cir. 2012); *see

New Breed Logistics*, 783 F.3d at 1074–75; *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510

(6th Cir. 2013); *Bluedorn*, 2009 WL 2252266, at *5.

EEOC contends that it was entitled to the spoliation instruction to counter Gregg's

defense that Keen was a poor performer. (Mem. at 11.) As noted earlier, Keen testified that she

received very positive evaluations in 2006, 2007, and 2008, while Bush admitted that it was

abnormal that the evaluations were not in Keen's file. EEOC argues that the instruction would

have ensured that Gregg did not benefit (as it allegedly did) from the fact that Keen's excellent reviews from those years were inexplicably missing.  (Mem. at 11–13.)

In support of its argument, EEOC points out that a juror asked a question about the missing reviews immediately after the close of evidence.  (4/2/15 Tr. at 74–75.)  One of the jurors asked the following question:

> Your honor, is there a way we can know if Mr. Adams' evaluation of other employees was adequate or appropriate?  My question is was Ms. Keen's performance noticed by a thorough manager previously ignored by a lackadaisical manager who had some feelings for this manager (Ms. Keen). . . . I'm just wondering if this is why she had glowing reviews and why reviews were missing.[8]

(*Id.*)  According to EEOC, the juror's question reveals that the juror perhaps inferred that Keen's outstanding reviews had not been earned, despite evidence to the contrary.  (Mem. at 13.)  Indeed, evidence at trial—including testimony from Skinner—demonstrated unequivocally that Keen had performed very well prior to January 2009.[9]

Nonetheless, despite the juror's question on a related point, we cannot agree with EEOC that a spoliation instruction was appropriate or that its omission was prejudicial.[10]  An adverse instruction based on spoliation is warranted only if the proponent establishes that: (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed;" (2) "the records were destroyed with a culpable state of mind;" and (3) the destroyed evidence was relevant to the claim at issue such that the jury could infer that it would have supported the claim.  *Adkins v. Wolever*, 692 F.3d 499, 504–05 (6th Cir. 2012); *Flagg v. City of Detroit*, 715

---

[8] In response, we informed the jury that they "ha[d] heard all of the evidence that is relevant and appropriate for [them] to hear in this case."  (4/2/15 Tr. at 86–87.)  We further stated that our answer did not indicate how we felt about the case.  (*Id.* at 87.)  We then proceeded with closing statements.

[9] Testimony also indicated, however, that Adams was not a stickler, (i.e., for checklists), like Sundwall.

[10] We add that EEOC did not renew its request for the instruction following receipt of the juror's question, even though the final jury instruction conference began very shortly thereafter.

F.3d 165, 177 (6th Cir. 2013); *Goodwin v. Nissan N. Am., Inc.*, 11 C 306, 2012 WL 2237110, at *2 (M.D. Tenn. June 15, 2012); *Wiseman v. Lipinksi*, 10 C 250, 2012 WL 928739, at *2 (M.D. Tenn. Mar. 19, 2012). Here, EEOC did not offer evidence that Gregg destroyed Keen's reviews at a time when it was obligated to preserve them. The circumstances and timing of the loss are entirely unknown. Moreover, EEOC did not present evidence—or even argue—that Gregg destroyed the evaluations "with a culpable state of mind." *Adkins*, 692 F.3d at 505.

We also are not convinced that the 2006, 2007, and 2008 evaluations would have meaningfully supported EEOC's position. Keen testified that her evaluations were always "exceeds expectations," and Gregg has not contested or contradicted that testimony. (*See* 3/31/15 Tr. (Skinner) at 54 (conceding that Keen was a good employee through 2008); 4/2/15 Tr. (Bush) at 41 (stating that she had no evidence to dispute Keen's characterization of her reviews).) Because Keen's performance prior to Sundwall's arrival was undisputed, the evaluations—to the extent they prove her good performance, as asserted—would have been redundant. In addition, these three evaluations would not have shed light on the juror's question, which sought information about Adams' motives and management style rather than the substance of the evaluations themselves. We have no reason to believe that the missing reviews would have explained how strict or lenient Adams may have been when supervising Keen, when supervising other managers, or why. Thus, even if EEOC had been entitled to a spoliation instruction, our refusal to give it under these circumstances can be no more than harmless error.

## C.     Challenges to Evidentiary Rulings

EEOC's remaining challenges to the verdict raise evidentiary issues. EEOC contends that it was prejudiced by: (1) Gregg's affirmative defense argument that Keen had not filed an internal complaint about Sundwall's increasing discipline; and (2) Gregg's questioning of Keen

about her divorce.  "Evidentiary rulings fall within the broad discretion of the district court."

*Hillside Prods., Inc. v. County of Macomb*, 389 F. App'x 449, 458 (6th Cir. 2010); *Penn, LLC v.*

*Prosper Bus. Dev. Corp.*, 600 F. App'x 393, 402 (6th Cir. 2015); *Taylor*, 517 F.3d at 378.  Even

where a court permits introduction of improper evidence at trial, "a new trial is proper only when

an abuse of discretion has an effect on the final result."  *Hillside*, 389 F. App'x at 458; *Cotton v.*

*City of Franklin*, 494 F. App'x 518, 525 (6th Cir. 2012); *Taylor*, 517 F.3d at 378.  In other

words, "a new trial is not warranted if the abuse of discretion constituted harmless error."  *Nolan*

*v. Memphis City Sch.*, 589 F.3d 257, 264–65 (6th Cir. 2009); *Hillside*, 389 F. App'x at 458;

*Taylor*, 517 F.3d at 378; *Koch v. Lightning Transp., LLC*, 13 C 225, 2015 WL 2125133, at *2

(M.D. Tenn. May 6, 2015).

### 1.       Failure to Complain as Affirmative Defense

As EEOC points out, Gregg emphasized throughout the trial that Keen did not complain

internally about the imposition of discipline from Sundwall, at any time.  Gregg established that

it maintains five paths for an employee to raise complaints about their working environment.

(*See* 4/1/15 Tr. (Keen) at 64–65.)  Gregg further stressed that Keen was well aware of those

options from her training, as well as from her prior complaints to Skinner about Adams and other

issues.  Yet, as Gregg repeatedly mentioned, Keen did not complain to anyone, at any time,

about the mounting discipline from Sundwall.  (*Id.* at 31–35, 42–43, 46, 53, 56–57, 63–65; *see*

*also* 4/2/15 Tr. (Bush) at 10–12, 32–33; 4/3/15 Tr. (Gregg closing) at 104, 114–16.)

As noted earlier, we instructed Gregg that it could introduce this evidence for certain

purposes but clarified that Gregg could not suggest to the jury that Keen was required to make

any internal complaint.  (3/31/15 Order at 3 (acknowledging that the law neither imposes such an

obligation on plaintiffs, nor offers any related defense).)  We also issued a limiting instruction

drafted by EEOC on this point.  (Marked Jury Instr. at 13 ("No Requirement of Internal Complaint").)  EEOC nonetheless contends that Gregg's position at trial constituted an improper affirmative defense, which was wrongly presented to the jury and was inconsistent with our prior order.  (Mem. at 9–11.)

Having considered the parties' arguments and the record, we conclude that we did not abuse our discretion in allowing the evidence and that Gregg's presentation did not exceed the bounds we set in our March 31, 2015 order.  Gregg articulated valid uses for the evidence, which we permitted, including its theory that Keen herself may not have deemed the CARs unfair.  At no time did Gregg argue or suggest to the jury that the success of her claim hinged on whether she had submitted an internal complaint.  To the contrary, counsel for Gregg, in closing, stated that: "you were told it's not a defense to [Gregg] that Ms. Keen did not report complaints.  And that's true."  (4/2/15 Tr. (Gregg closing) at 114.)  Counsel then argued, as allowed, that her failure to complain was "a signal that she didn't believe she had a valid complaint to report." (*Id.*)  Gregg also relied on this evidence to demonstrate that Keen had complained internally on prior occasions, without suffering any alleged retaliation.  (*Id.* at 114–16.)  This evidence and argument were relevant and admissible, and Gregg did not violate our March 31, 2015 order.

Even if we erred in allowing Gregg to introduce such evidence, any such error was harmless.  EEOC prepared, and we delivered, a limiting instruction to the jury, which read:

> The law does not require an employee who is facing retaliation to make an internal complaint to her employer about that.  Therefore, you may consider evidence that Courtney Keen did not make an internal complaint to Gregg about her Corrective Action Reports only to the extent that it helps you decide whether those Corrective Action Reports were accurate or inaccurate, or to the extent it helps you decide whether Gregg's actions were motivated by retaliatory animus or not.  If you find that Gregg discharged Ms. Keen in retaliation for her report of sexual harassment, the fact that Ms. Keen may not have made an internal complaint to Gregg is not a defense, and your verdict must be for the Plaintiff.

(Marked Jury Instr. at 13; *see also* Dkt. No. 242.)  This instruction explained that, if EEOC proved its case, the jury must find in its favor even though Keen did not make any internal complaints.  As mentioned earlier, we presume that "juries 'follow their instructions.'"  *Esparza*, 765 F.3d at 623 (quoting *Richardson*, 481 U.S. at 211, 107 S. Ct. at 1709)); *Lawrence*, 735 F.3d at 403.  We have no reason to suspect that the jury misunderstood or ignored this very clear instruction, and EEOC has not argued otherwise.  *Esparza*, 765 F.3d at 623; *Lawrence*, 735 F.3d at 403.

Nor can we conclude that this evidence, with or without the limiting instruction, infected the trial with such prejudice that a new trial should be granted.  *See, e.g.*, *New Breed Logistics*, 783 F.3d at 1066; *Balsley*, 691 F.3d at 761.  "Simply because evidence is damaging to a party's case does not mean the evidence presents the type of bias and prejudice the Federal Rules were designed to preclude from use at trial."  *Hall v. City of Clarksville*, 03 C 1229, 2006 WL 2038005, at *3 (M.D. Tenn. July 18, 2006).  Gregg introduced the evidence consistent with our order, the evidence was relevant to its position, and the parties vigorously debated the point in their arguments to the jury.  We find no error or prejudice here and thus deny the motion.

### 2.    Violation of In Limine Order concerning Keen's Divorce

On August 25, 2014, Judge Sharp granted a motion in limine presented by EEOC and precluded Gregg from introducing evidence of Keen's divorce decree at trial, unless Keen opened the door to that line of questioning.  (8/25/15 Tr. at 33–37 (Dkt. No. 180); *see also* Dkt. No. 179.)  Despite that order, counsel for Gregg mentioned the divorce decree in his opening statement when discussing damages.  (3/31/15 Tr. (Gregg opening) at 24.)  Gregg argued that Keen had lost her home not because she lost her job, but because "[s]he made a bad

decision with her attorney in her divorce settlement to buy out her ex-husband all of the equity." (*Id.*)  Counsel for EEOC objected, and we sustained the objection.  (*Id.*)

Gregg returned to this topic during its cross-examination of Keen.  (4/1/15 Tr. (Keen) at 25–27.)  We overruled EEOC's objection and allowed limited inquiry.  (*Id.* at 26.)  Keen admitted during questioning that she had been required to buy out her ex-husband's equity in their family home.  Counsel then asked whether that deal caused her to give up the house because it was unaffordable.  Keen responded that she had to take that step because she "didn't have a job to pay anything toward the house."  (*Id.* at 27.)  EEOC contends that Gregg's questioning of Keen about the divorce decree "was prejudicial because it allowed the jury to infer that Keen did not suffer any economic loss" due to Gregg's conduct.  (Mem. at 17.)

We disagree because—even assuming that Gregg's conduct violated Judge Sharp's order or that our ruling at trial was erroneous—this line of questioning could not have had any "effect on the final result."  *Hillside*, 389 F. App'x at 458; *Cotton*, 494 F. App'x at 525; *Taylor*, 517 F.3d at 378.  That is, even if the jury inferred that Keen suffered no economic loss as a result of her termination,[11] that inference would have had no effect on the jury's determination of liability.  Evidence and argument about the loss of her home or income relate only to Keen's damages but do not relate to liability.  Accordingly, any mistake on our part, or on the part of Gregg's counsel, was harmless.  *See, e.g.*, *Doe v. Rutherford County, Tenn. Bd. of Educ.*, 13 C 328, 2015 WL 475414, at *7 (M.D. Tenn. Feb. 4, 2015) (defense counsel's allegedly improper argument as to damages could not reasonably have affected liability finding).

---

[11] In any event, it seems unlikely that the jury would have drawn such a broad inference as to damages, both as a practical matter, (i.e., jurors presumably understand that people who lose their jobs involuntarily no longer have an income and may not be able to pay their bills), and because they heard Keen's specific testimony about why she needed her job and how she struggled to find another position with comparable pay after her termination.  (*See, e.g.*, 4/1/15 Tr. (Keen) at 6–7, 20–22, 23–25.)

**CONCLUSION**

Having evaluated all of the evidence and jury instructions presented at trial, we cannot hold that the "jury has reached a seriously erroneous result." *New Breed Logistics*, 783 F.3d at 1066; *Balsley*, 691 F.3d at 761. As a result, and for the reasons set forth above, we conclude that a new trial is not warranted under Rule 59. EEOC's motion for a new trial is therefore denied. (Dkt. No. 261.) It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: August 17, 2015
        Chicago, Illinois